STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
WILFORD GANTT, A/K/A OMAR,
DEFENDANT-APPELLANT.

Argued October 7, 1985—Decided January 30, 1986.

*Anderson D. Harkov,* Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney; *Anderson D. Harkov* and *Edward P. Hannigan,* Assistant Deputy Public Defender, of counsel and on the briefs).

*John G. Holl,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

We granted certification in this case to determine whether the State must prove that a handgun used in an armed robbery was operable before a court may impose a sentence under the Graves Act, which requires mandatory-minimum terms of imprisonment for persons convicted of designated crimes involving the use of a "firearm." The case arises in the context of an unarmed accomplice's liability when his armed co-felon is never apprehended and the weapon is never recovered or produced. We agree with the courts below that proof of a gun's operability is not inherent in the definition of "firearm," and therefore is not an essential element in the imposition of a Graves Act sentence. We therefore affirm the sentence imposed under the circumstances presented here.

I

The facts of this case are set forth in the trial court opinion, *State v. Gantt,* 186 *N.J.Super.* 262, 264 (Law Div.1982), and need not be repeated at length here. A jury convicted Gantt of a 1981 armed robbery, in violation of *N.J.S.A.* 2C:15–1. In the incident, Gantt and an unidentified companion robbed a coworker of Gantt at gunpoint. Although Gantt himself was apparently unarmed, his complicity in the crime exposed him to conviction for armed robbery to the same extent as his armed co-felon. *See N.J.S.A.* 2C:2–6(b)(3) (accomplice liability). Gantt had previously been convicted of armed robbery under similar circumstances in 1974. As noted, Gantt's co-felon was never apprehended; nor was the weapon used in the robbery, a handgun, ever recovered.

At the time of sentencing, the trial court held hearings to determine (1) whether the Graves Act's mandatory-minimum-sentencing provisions were applicable to the unarmed accomplice in an armed robbery; (2) if so, whether the State, as the Graves Act requires, had demonstrated by a preponderance of the evidence that the unrecovered weapon was a "firearm," which would subject the defendant to the act's mandatory-sentencing provisions; and (3) whether a person twice convicted as the unarmed accomplice in armed robberies is eligible to be sentenced to additional time in prison under the act's mandatory extended-term provisions. The trial court answered all these questions in the affirmative and sentenced defendant to an extended term of 25 years with a mandatory-minimum parole bar of one third of that sentence, or 8⅓ years.

On the second question, the court ruled that the definition of "firearm" incorporated in the Graves Act did not require a showing that the weapon in question was operable. *State v. Gantt, supra,* 186 *N.J.Super.* at 266. The court held alternatively that even if a showing of operability were required, there was "more than sufficient evidence" in the record to invoke an "inference of operability." *Id.* at 268. It also rejected defendant's contentions that an unarmed accomplice was subject to neither the Graves Act, *id.* at 275, nor its extended-term provisions. *Id.* at 280. The Appellate Division affirmed on all issues. *State v. Gantt,* 195 *N.J.Super.* 114 (1984). In particular, the appellate panel concluded that "neither a handgun * * * nor a rifle * * * nor a shotgun * * * nor a machine gun * * * need be operable for that weapon to qualify as a firearm" for purposes of imposing a Graves Act sentence. *Id.* at 118–19 (citations omitted).

Because we had already determined that the unarmed accomplice in an armed robbery is subject to Graves Act sentencing, *State v. White,* 98 *N.J.* 122, 126 (1984), we limited our grant of certification to the single issue of whether a firearm must be proven operable before a Graves Act sentence may be imposed. 101 *N.J.* 220 (1985).

## II

The Graves Act, *N.J.S.A.* 2C:43–6(c) to (d), provides generally that one who uses or possesses a "firearm" while committing, attempting to commit, or fleeing after committing certain enumerated serious offenses must be sentenced to imprisonment for a term that includes at least three years of parole ineligibility. *N.J.S.A.* 2C:43–6(c). An exception is made in the case of a fourth-degree crime involving the use of a firearm, where the minimum term of parole disqualification is dropped to 18 months.

In addition to mandating minimum terms for firearms-related offenses, the Graves Act also requires extended mandatory-minimum terms for Graves Act second offenders:

A person who has been convicted of an offense enumerated by this subsection and who used or possessed a firearm during its commission, attempted commission or flight therefrom and who has been previously convicted of an offense involving the use or possession of a firearm as defined in 2C:44–3d., shall be sentenced by the court to an extended term as authorized by 2C:43–7c., notwithstanding that extended terms are ordinarily discretionary with the court.

[*N.J.S.A.* 2C:43–6(c).][1]

The extended-term sentences mandated for Graves Act second offenders are set by *N.J.S.A.* 2C:43–7(c), which incorporates as well a mandatory-extended-parole bar:

In the case of a person sentenced to an extended term pursuant to 2C:43–6c. and 2C:44–3d., the court shall impose a sentence within the ranges permitted by 2C:43–7a.(2), (3), (4) or (5) according to the degree or nature of the crime for which the defendant is being sentenced, which sentence shall include a minimum term which shall be fixed at, or between one-third and one-half of the

---

[1]Ordinarily, the imposition of an extended-term sentence is a discretionary matter, *see N.J.S.A.* 2C:43–7(a), dependent upon a request by the prosecution and the presence or absence of certain sentence-enhancement criteria set forth in section 2C:44–3. One of those criteria, however, the "[s]econd offender with a firearm," *see N.J.S.A.* 2C:44–3(d), is excepted from discretionary treatment. Section 2C:44–3 provides that "[i]f the grounds specified in subsection d. [2C:44–3(d) ] are found, and the person is being sentenced for commission of any of the offenses enumerated in [the Graves Act], the court *shall* sentence the defendant to an extended term as required by [the act], and application by the prosecutor shall not be required." (emphasis added).

sentence imposed by the court or 5 years, whichever is greater, during which the defendant shall not be eligible for parole. Where the sentence imposed is life imprisonment, the court shall impose a minimum term of 25 years during which the defendant shall not be eligible for parole.

[*N.J.S.A.* 2C:43–7(c).]

For the first-degree offense of armed robbery, *see N.J.S.A.* 2C:15–1(b), section 2C:43–7(a)(2) provides an extended-term sentencing range of between twenty-years and life imprisonment. Hence, under the circumstances of a Graves Act second offender now being sentenced for armed robbery, the Code obligates the trial court to impose at least a twenty-year term with a minimum extended period of parole ineligibility of one third of 20 years or 6 ⅔ years.

This is not our first encounter with the Graves Act. In *State v. Des Marets,* 92 *N.J.* 62 (1983), we upheld the act against constitutional challenge as well as a challenge to its ban on sentencing youthful offenders to indeterminate terms at the Youth Correctional Institution Complex. *See N.J.S.A.* 2C:43–5 (diversionary treatment for young-adult offenders). We held that the Legislature's intent behind the minimum term mandated by the Graves Act left no room for exceptions for those who commit crimes with firearms; its deterrent policies overrode the rehabilitative purposes underlying the discretionary sentencing provided for in our youthful-offender statutes. *Des Marets, supra,* 92 *N.J.* at 74–76. In *State v. Stewart,* 96 *N.J.* 596 (1984), we discussed the procedure for imposing a Graves Act sentence, and clarified that the purpose of the act contemplated imposition of sentences for constructive possession of weapons in circumstances where the weapon was immediately available to, if not actually in the hands of, the criminal offender. *Id.* at 604. Finally, as noted, in *State v. White, supra,* 98 *N.J.* at 126, we held that the legislative purpose was intended to apply as well to unarmed accomplices found guilty under the armed feature of the charge, or when the evidentiary hearing conducted by the sentencing judge disclosed that the defendant knew or should have known firearms were to be used in the commission of the crime. We draw on our familiarity with the

policies underlying the Graves Act to better inform our decision in this case.[2]

## III

We begin our analysis by noting that the question of operability can arise in different contexts. *See, e.g., State v. Harmon,* 203 *N.J.Super.* 216 (App.Div.), *certif. granted,* — *N.J.* — (1985) (whether operability is essential element of substantive firearms-possession offense); *State v. Morgan,* 121 *N.J.Super.* 217 (App.Div.1972) (same); Annot., 28 *A.L.R.*3d 845, 863–65 (1969) (collecting cases on question of operability as element of substantive offense). Here, we address only the relevance of operability in the context of sentencing.

The Graves Act, by its terms, requires that the grounds for imposing a mandatory-minimum sentence be established at a post-conviction hearing. In particular, the act requires the State to demonstrate that the weapon in question was a "firearm":

> At the hearing, which may occur at the time of sentencing, the prosecutor shall establish by a preponderance of the evidence that the weapon used or possessed was a firearm. In making its finding, the court shall take judicial notice of any evidence, testimony or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.
>
> [*N.J.S.A.* 2C:43–6(d).]

---

[2]We note that the United States Supreme Court has agreed to decide two cases this Term bearing on the propriety of enhancing sentences for firearms-related offenses. In *Commonwealth v. Wright,* — *Pa.* —, 494 *A.*2d 354, *cert. granted sub nom. McMillan v. Pennsylvania,* 474 *U.S.* —, 106 *S.Ct.* 58, 88 *L.Ed.*2d 47 (1985), the Court will review the constitutionality of Pennsylvania's mandatory-minimum sentencing act, which, like the Graves Act, imposes a minimum prison term for defendants found to be in "visible possession" of firearms during the commission of certain felonies. The Court will also review whether, under federal law, a defendant who uses an unloaded pistol during a bank robbery can receive a larger penalty for possessing a "dangerous weapon" during the course of a felony. *See McLaughlin v. U.S.,* — *U.S.* —, 106 *S.Ct.* 308, 88 *L.Ed.*2d 285 (1985) (granting *certiorari,* decision below unreported).

The Graves Act incorporates the definition of "firearm" contained in our Gun Control Law, *L.* 1966, *c.* 60, as amended, *N.J.S.A.* 2C:39-1 to -15. A "firearm" is there defined as

any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances. It shall also include, without limitation, any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eights of an inch in diameter, with sufficient force to injure a person.

[*N.J.S.A.* 2C:39-1(f).]

Defendant seizes upon the language "from which may be fired" to urge that the statute requires proof of operability. We disagree. As more fully developed below, we think the defendant's reliance on this clause in the statutory definition is misplaced.

Initially, we note that our review of the cases in this area reveals little agreement on the question of whether "firearm" invariably means "operable firearm." The cases appear to divide three ways: those that hold an inoperable weapon is not a firearm; those that hold an inoperable weapon is a firearm; and those where the question turns on the extent to which the weapon may be readily returned to operable condition. *State v. Pelzer,* 230 *Kan.* 780, 781, 640 *P.*2d 1261, 1263 (1982) (surveying cases). Most of the courts that have resolved the issue have concluded that whether a particular weapon falls within the statutory definition of firearm depends on the nature and purpose of the statute, and the intent of the Legislature.

■ It is "graphically clear," *State v. Des Marets, supra,* 92 *N.J.* at 69, that the Graves Act is directed at real guns that pose actual physical dangers to the potential victims of crime. In *Des Marets,* we reviewed the alarming growth in the criminal use of firearms and concluded that "[t]hese disturbing statistics confirm the obvious intent of the Graves Act to deter the use

and possession of firearms by criminals for the purpose of reducing the number of persons killed or injured by such weapons." 92 *N.J.* at 72. As the Assembly Judiciary Committee noted in discussing the legislative goal of the forerunner to the Graves Act:

> Crimes committed with guns are on the rise and deaths from these crimes are also increasing. Guns are particularly dangerous weapons, all too easy to use and to kill with if used. The purpose of this bill is to make criminals think twice before going forth to commit crimes armed with guns.
>
> [Assembly Judiciary, Law, Public Safety and Defense Comm., Statement to S. 1071 (July 24, 1980).] [3]

The emphasis on reducing death and serious injury demonstrates that the act is concerned with the objective prospect of harm associated with real guns capable of killing. [4]

It does not necessarily follow, however, that because the Graves Act is concerned only with real guns, the statute requires proof of a weapon's operability. Nothing we have said thus far suggests that the statute defines a firearm in terms of a device's operability. Quite the contrary appears true.

The Graves Act incorporates a definition of "firearm" not in terms of operability, but in terms of what the weapon was designed to do. It adopts the definition of firearm contained in *N.J.S.A.* 2C:39–1(f) and quoted above.

---

[3] S. 1071 was vetoed by Governor Byrne in 1980 in part because he thought the number of offenses covered was too expansive, and in part because of the intrusion upon traditional principles of judicial discretion. *See* Veto Message of the Governor, S. 1071, at 1–2 (1980). In its place, the Legislature enacted S. 3057, which reduced the number of offenses subject to Graves Act sentencing. S. 3057 ultimately became *N.J.S.A.* 2C:43–6(c) to (d). But as we stated in *State v. Des Marets, supra,* 92 *N.J.* at 72 n. 10, "[a]lthough the specific provisions of the Graves Act differ from S. 1071, * * * no one disputes the fact that the underlying purpose of the legislation has remained the same."

[4] We also find it persuasive that the closest pre-Code analogue to the Graves Act, former *N.J.S.A.* 2A:151–5, *repealed by L.* 1978, *c.* 95, § 2C:98–2, imposed additional prison time for crimes committed while the actor was in possession of a firearm, "whether or not capable of being discharged," and regardless of whether the weapon was a "toy or imitation." The Graves Act contains no similar language.

That definition begins by listing three types of weapons that are readily recognizable as firearms: handguns, rifles, and shotguns. Each of those weapons is defined separately in the Code not in terms of its capability of discharging a projectile, but in terms of its design. *See N.J.S.A.* 2C:39–1(k), (m), and (n). "Handgun," for example, is defined as "any pistol, revolver or other firearm originally designed or manufactured to be fired by the use of a single hand." *N.J.S.A.* 2C:39–1(k). It obviously follows that if a weapon is, by virtue of its design, a handgun, it is also a firearm within the meaning of the Graves Act.

The defendant suggests, however, that the list of "handgun, rifle, [and] shotgun" is modified by the later language "or any gun * * * in the nature of a weapon from which may be fired or ejected any * * * missile or bullet * * *." *See N.J.S.A.* 2C:39–1(f). The contention that this clause imposes a requirement of demonstrable operability is unpersuasive. The operative word in the clause is the disjunctive "or," and as such, it does not modify the list of weapons defined in terms of their original design. We view this clause, as did the courts below, as essentially descriptive and non-restrictive: it subsumes within the definition of firearm those weapons that are not readily recognizable as either handguns, rifles, or shotguns, but that are nonetheless designed to produce the same deadly results. As the Appellate Division stated, this latter class of less-familiar firearms "can best, and perhaps only, be described in terms of their operation." 195 *N.J.Super.* at 117. *See also State v. Mieles,* 199 *N.J.Super.* 29 (App.Div.1985) (holding that Code's definition is broad enough to include a BB gun as a firearm).

 We are satisfied that Graves Act sentencing contemplates a "firearm" not in terms of a device's present operability, but in terms of its original design. We therefore agree with the conclusion of the court in *State v. Ortiz,* 187 *N.J.Super.* 44, 49–50 (App.Div.1982), that a fake or toy gun is not a firearm within the meaning of section 2C:39–1(f) and the Graves Act— not because the device is proven presently inoperable, but

because the instrument was never designed to fire a potentially-deadly missile. The simple fact is that the actual danger with which the Graves Act is concerned is nowhere present when the actor uses a toy or fake gun.[5] It follows as well that the fact that a real gun is unloaded, in disrepair, or temporarily non-functional is irrelevant in Graves Act proceedings because those characteristics do not reflect on the weapon's original lethal design. *See State v. Harmon, supra,* 203 *N.J.Super.* at 227 (firearm is defined by statute in terms of design and intended use and does not require proof of present operability).

Further, we believe it was reasonable for the Legislature to draw the line at design rather than requiring post-conviction inquiries into a weapon's operability. We find no evidence in the language or purpose of the Graves Act to suggest that its framers contemplated a ballistics test as part of the sentencing process. Such a rule would effectively eliminate the application of the Graves Act in all cases in which the defendant has discarded or secreted a weapon. We do not think that the Legislature intended that consequence. For although requiring proof that a gun was fully operational at the time of the crime would be the most accurate gauge of actual danger, determining whether the instrument was designed to deliver lethal force is nonetheless an extremely accurate gauge of potential danger. We therefore believe that the Legislature could well conclude that devices, particularly pistols, designed to be fired by the use of a single hand pose an extraordinary threat to the safety of

---

[5]We note that the definition of "deadly weapon" contained in *N.J.S.A.* 2C:11–1(c), subsumes both weapons capable of actual injury and those where the victim would be led "reasonably to believe [the device] to be capable of producing death or serious bodily injury." The distinction between the definitions of "firearm" and "deadly weapon" has the potential for producing somewhat anomalous results. For example, a person committing robbery with a toy gun is subject to conviction for first-degree rather than second-degree robbery because he is armed with a "deadly weapon." *See N.J.S.A.* 2C:15–1(b). The conviction would not, however, subject the defendant to a Graves Act minimum sentence because the "deadly" weapon involved would not be a firearm under *N.J.S.A.* 2C:39–1(f).

our citizens, and that nothing more need be shown than such design in order to invoke Graves Act sentencing.

Our concurring member, Justice Handler, questions whether we are masking what he views is our recognition of "the essentiality of * * * operability" in "the sheep's clothing of design," *post* at 595, and suggests that there is no difference between our focus on design and his preference for employing "a rebuttable presumption of operability for purposes of determining whether [a] weapon * * * was a 'firearm' * * *." *Post* at 596. We think not. Invocation of the fiction of a legal presumption is precisely what the statute seeks to avoid: it would invariably invite assertions of inoperability by defendants hopeful of gaining some advantage in the murky waters of law characteristic of rebuttable presumptions and shifting burdens of proof. *See Sandstrom v. Montana,* 442 *U.S.* 510, 516–18, 99 *S.Ct.* 2450, 2455–56, 61 *L.Ed.*2d 39, 46–47 (1979) (discussing the various ways in which a factfinder may interpret a legal "presumption," and the differing consequences on the burden of production or persuasion that may result). By its converse implication—that operability is an essential element to be proven—the concurrence's approach would invite as well protracted inquiry into issues that we are sure the Legislature never intended, for example, whether or not a trigger was jammed, a barrel broken, or a firing pin missing at the time of the crime. Hence, we believe that the use of the device of inferring operability is an artificial and unnecessary step in determining what is a "firearm" for purposes of Graves Act sentencing.

## IV

Viewing operability as not an essential element of the State's burden in the context of weapons-related offenses is consistent with our prior decisional law and with the approach of other jurisdictions.

Prior cases in this jurisdiction, although phrasing the question in terms of the creation of "a rational inference * * * tantamount to legal proof * * * that the gun is capable of being fired," *State v. Harmon, supra,* 203 *N.J.Super.* at 227 n. 6 (quoting *State v. Schultheis,* 113 *N.J.Super.* 11, 16 (App.Div.), *certif. denied,* 58 *N.J.* 390 (1971)), did not insist upon a demonstration of operability as a predicate to certain weapons-related offenses where the weapon was not recovered or where evidence of operability was otherwise lacking. *See, e.g., State v. Cole,* 154 *N.J.Super.* 138, 146–47 (App.Div.1977), *certif. denied,* 78 *N.J.* 415 (1978) (prosecution for assault, armed robbery, and weapons-possession offenses); *State v. Schultheis, supra,* 113 *N.J.Super.* at 16 (prosecution for unlawful weapons possession, threatening the life of another, bookmaking, and breaking and entering with intent to assault).[6]

Other jurisdictions facing similar questions under felony-firearm statutes and sentencing schemes have adopted similar reasoning.[7]

---

[6]For a fuller analysis of New Jersey's gun-control and deadly-weapons law, both pre-Code and post-Code, *see generally State v. Mieles,* 199 *N.J.Super.* 29 (App.Div.1985), and *State v. Middleton,* 143 *N.J.Super.* 18, 24 (App.Div.1976), *aff'd,* 75 *N.J.* 47 (1977) (Seidman, J.A.D., dissenting).

[7]See, *e.g., State v. Millett,* 392 A.2d 521, 527–28 (Me.1978) (jury warranted to find, on the basis of lay testimony describing instrument projecting from defendant's belt, that weapon was a real gun and it was not necessary for state to prove operability); *Benson v. State,* 640 P.2d 83, 86 (Wyo.), *cert. denied,* 456 *U.S.* 1006, 102 *S.Ct.* 2297, 73 *L.Ed.*2d 1301 (1982) (absent appellant's introduction of evidence that the firearm was inoperable, it is not error to fail to instruct the jury that operability is an essential element in firearms-possession conviction); *People v. Brooks,* 135 *Mich.App.* 193, 196–98, 353 *N.W.*2d 118, 120–21 (Ct.App.1984) (operability of a firearm is irrelevant to the determination of guilt under a felony-firearms statute imposing two-year mandatory-minimum sentences); *People v. Taylor,* 151 *Cal.App.*3d 432, 436–37, 199 *Cal.Rptr.* 6, 9–10 (Ct.App.1984) (proof of operability is not essential to conviction for firearms-possession offense or to imposition of enhanced sentence for felonies committed while armed).

*But cf. United States v. Wilson,* 721 F.2d 967, 972 n. 5 (4th Cir.1983) ("The operability of a weapon is legally relevant to the definition of a 'firearm' under

We find particularly persuasive the realism embraced in the decision of the Maine Supreme Judicial Court in *State v. Millett*, 392 *A*.2d 521 (Me.1978), a case under former Maine law that concerned whether the operability of a gun had to be established before the defendant could be convicted under a firearms-possession statute. After initially concluding that the statute applied only to "real" guns, *id.* at 526–27, the Court held that the factfinder could infer from lay testimony that the object involved was a real gun.

In the real setting of the courtroom, judge and jury know how to find out if an authentic gun is involved. In *Millett*, the trial court explained to the jury:

> Once again, we are talking about a real gun capable of discharging a projectile of some sort, not talking about a toy gun, not talking about a water gun, not talking about a plastic gun that can't fire a projectile. We are talking about a real gun here.
>
> [*Id.* at 527.]

The Maine Court concluded that a jury so instructed could find, on the basis of witnesses' observations that one saw "at belt level the brown handle and hammer of a handgun sticking out of his clothing," and another what he thought "could have been a 357 magnum pistol" projecting from defendant's belt, that the instrument was authentic and therefore a real gun. "It is not essential to the validity of such a finding that the firearm itself be admitted in evidence as an exhibit." *Id.* at 527. The

---

18 U.S.C. § 921(a)(3), but the weapon need not be operational * * * as transported in foreign commerce, so long as it 'may readily be converted' to that status."); *People v. Shaffer*, 105 *A.D*.2d 863, 865, 482 *N.Y.S*.2d 364, 367 (App.Div.1984), *aff'd as modified*, 66 *N.Y*.2d 663, 495 *N.Y.S*.2d 965, 486 *N.E*.2d 823 (1985) (Levine, J., concurring in part and dissenting in part) (New York Penal Code requires proof of operability of weapon in order to sustain deadly-weapons convictions); *York v. State*, 56 *Md.App.* 222, 227–29, 467 *A*.2d 552, 555–56 (Ct.Spec.App.1983), *cert. denied*, 299 *Md.* 137, 472 *A*.2d 1000 (1984) (Maryland statute defines firearm in terms of operability, but an inoperable handgun, readily capable of being rendered operable, will support conviction for unlawful use of firearms).

inference is not dependent upon production of the weapon and may continue "until some evidence is presented * * * tending to establish the inoperability of the gun involved." *Id.*

While we achieve a similar result, we prefer to state the issue not in terms of inferring "operability" from design, but in the more straightforward terms of merely inquiring whether an object designed to deliver deadly force has been so substantially altered as no longer to qualify as such. We emphasize that the danger to the public with which the Graves Act is concerned is absent only when there has been a total alteration of the weapon's design. *Compare State v. Morgan,* 121 *N.J.Super.* 217, 220 (App.Div.1972) ("a firearm is no less a firearm if it is rendered temporarily inoperable * * * by need of some minor repair or adjustment") *with People v. Stevens,* 409 *Mich.* 564, 297 *N.W.*2d 120 (1980) (starter pistol was by design incapable of firing and thus was not a gun, revolver, or pistol). As was stated in *State v. Morgan, supra*:

> It may become a question of fact as to whether a particular device possesses or retains the characteristics of a firearm as thus defined. Conceivably, although having initially possessed such characteristics, it may have lost them through mutilation, destruction or disassembly. Where there appears to be a legitimate dispute as to whether any such device possesses or retains the essential characteristics * * * [t]hat question should be resolved as other questions of fact.
>
> [121 *N.J.Super.* at 219.]

To recapitulate, we hold that the Graves Act requirement that the State prove that the weapon involved was a "firearm" requires neither proof nor a court finding that the weapon was operable. The court need be satisfied only that the device was originally designed to deliver a potentially-lethal projectile and hence "real." The conclusion regarding the design of the instrument may be based on the variety of forms of proof listed in the Graves Act, *N.J.S.A.* 2C:43–6(d). In addition, we note in particular that an object's authentic design may be inferred from appearance or based on lay testimony,

but in no case is it dependent upon empirical examination of the weapon.[8]

■ The issue of so-called "inoperability" should enter the case only if it bears on the question of design—only if and when substantial evidence is introduced, from whatever source it may come, tending to show either that the object is of innocuous design, or that it has undergone such substantial alteration or mutilation that the instrument has completely and permanently lost the characteristics of a real gun. Only then must the factfinder determine whether the State has sustained its overall burden of establishing, by a preponderance of the evidence, that the instrument used or possessed was a "firearm" as defined. That determination should be resolved as are other questions of fact.

---

[8]Inferring the authenticity of a weapon from its appearance or from the testimony of lay witnesses is entirely consistent with prior law in New Jersey and with a number of holdings from other jurisdictions. *See State v. Magwood,* 177 *N.J.Super.* 105, 107 (App.Div.), *certif. denied,* 87 *N.J.* 327 (1981) (defendant's prior-inconsistent statement that weapon was real was sufficient evidence to support armed-robbery conviction even though at trial he claimed weapon was a toy); *State v. Cole,* 154 *N.J.Super.* 138, 146 (App.Div.1977), *certif. denied,* 78 *N.J.* 415 (1978) (testimony that witness heard a "click click" that sounded "like you pull a trigger back off a revolver" was sufficient to support conclusion that device was real gun); *State v. Schultheis, supra,* 113 *N.J.Super.* at 14 (testimony of young boy that he saw handle and barrel sufficient to conclude instrument was gun); *see also Commonwealth v. Layton,* 452 *Pa.* 495, 497, 307 *A.2d* 843, 844 (1973) (factfinder can infer operability from object that "looks like, feels like, sounds like or is like, a firearm"); *Couplin v. State,* 37 *Md.App.* 567, 575–77, 378 *A.2d* 197, 202–03 (Ct.Spec.App.1977) (non-recovery of handgun did not preclude conviction where credible evidence suggested weapon was authentic, even though state ostensibly has burden of proving use of a real gun); *cf. State v. Zayas,* 3 *Conn.App.* 289, 297–99, 489 *A.2d* 380, 385–86 (App.Ct.), *certif. denied,* 195 *Conn.* 803, 491 *A.2d* 1104 (1985) (in prosecution for carrying a pistol without a permit, jury could reasonably conclude pistol was operable and therefore a firearm even though when found the pistol was jammed and could not be discharged); *Commonwealth v. Stallions,* 9 *Mass.App.* 23, 24–25, 398 *N.E.2d* 738, 740–41 (App.Ct.1980) (in prosecution for unlawfully carrying a firearm, jury could infer operability without the aid of expert testimony that weapon had been tested and found to be a real "firearm").

## V

Applying these principles to this case leads us to affirm the imposition of the extended mandatory-minimum term.

■ The evidence in this case, although scant, is credible and sufficient to justify an inference by the factfinder that the weapon involved was a "firearm" in the sense of an instrument designed to fire a projectile. While the weapon used in this armed robbery was never recovered, the victim testified that the defendant's unidentified accomplice had "a small handgun in his hand." He said he saw the barrel and handle of the pistol. The trial court found "no testimony to contradict the conclusion that the gun was real." *State v. Gantt, supra,* 186 *N.J.Super.* at 267. The defendant himself did not dispute this finding. He offered no evidence that the weapon was either fake or rendered permanently harmless. He rested instead on the mere premise that the State had to prove the weapon operable before the court could conclude it was real. We disagree. In the absence of substantial evidence to the contrary, the trial court was justified in concluding that the handgun here was real and therefore a firearm within the meaning of *N.J.S.A.* 2C:39-1(f) and the Graves Act.

■ We note in closing that it may be necessary to permit evidence of inauthenticity or design alteration to come in outside of the guilt phase of the trial, lest a defendant be compelled to give incriminating evidence of presence at the scene of an offense in order to avoid the mandatory sentence. *Cf. State v. Ingram,* 98 *N.J.* 489, 499 (1985) (possession of gun permit may be demonstrated out of presence of jury in order to avoid undercutting defense of no possession).

Here, since operability of the gun was not an essential element for the State to prove, and because there was no other evidence tending to disprove the authenticity of the gun, we agree with the lower courts that there was sufficient evidence before the court to determine that at a minimum this instrument met the definition of a handgun—an object designed to fire

a deadly projectile from the hand—and was therefore a firearm for Graves Act purposes.

The judgment of the Appellate Division is affirmed.

HANDLER, J., concurring.

During the course of our decisional treatment of the issues relating to the scope and content of the Graves Act, *N.J.S.A.* 2C:43–6c, I have expressed strong differences from the views endorsed by the majority of the Court. In *State v. Des Marets*, 92 *N.J.* 62 (1983), this Court gave singular and overwhelming emphasis to the deterrent purpose of the Graves Act to launch its thesis that the Act dictated "broad coverage" rather than narrow application. In accordance with its perception of deterrence, it ruled that the Act included defendants in "possession of a firearm, without any need to demonstrate intent to use...." *Id.* at 68. Although I agreed with the majority "that the overriding purpose of the Graves Act is deterrence," *id.* at 97 (dissenting and concurring opinion), I felt that the Court had gone well beyond the bounds envisioned by the Legislature itself under the Graves Act in order to accomplish the needs of penal deterrence. In my opinion, "[t]he majority's reading of the statute to cover simple possession without any intent to use a weapon criminally ... strain[ed] the language of the statute * * *." *Id.* at 162. The import of the statutory language employed by the Legislature, in conjunction with the imperative for strict construction that arises from the ambiguity of a penal statute, demanded that "intent to use" be deemed a necessary component of the critical statutory phenomenon of "possession." Accordingly, I expressed the view that bare or simple possession of a gun in the absence of a demonstrable or inferable intent to use it in the commission of a crime was insufficient to invoke the automatic and mandatory penal sanctions of the Graves Act. *Id.* at 106.

In *State v. Stewart*, 96 *N.J.* 596 (1984), a rapprochement with the majority seemed possible. I acknowledged the precedential

authority of the Court's *Des Marets* holding, although I remained unpersuaded as to its soundness. Accordingly, I joined in the Court's ruling that "possession of a firearm for the purposes of the Graves Act includes not only actual possession but constructive possession that the defendant is able to convert practically immediately to actual possession." *State v. Stewart, supra,* 96 *N.J.* at 604. I took some comfort in the Court's strict, realistic and fair interpretation of the concept of "possession" for Graves Act purposes.

I was jilted by the Court's decision in *State v. White,* 98 *N.J.* 122 (1984). In *White,* the majority, again marching to its own deterrence drummer, ruled that if the accomplice "knew or had reason to know before the crime was committed that his partner would possess or use a firearm while the crime was being committed, or during the immediate flight thereafter ...," then, even though the accomplice was unarmed, was not in actual or constructive possession of the gun and, indeed, nowhere near the gun, the accomplice-defendant could still be guilty of "the same crime as the individual who possessed or used the gun," and, by a quantum leap, would be subject to the mandatory sentencing provisions of the Graves Act. *Id.* at 130–31. *White,* in my estimation, was inconsistent both with the *Stewart* requirement that there must be the "ability to exercise imminent control over the firearm" (96 *N.J.* at 604), and with the core rule of *Des Marets* that "intent to use" is not a constituent element of Graves Act possession as defined by *Stewart* (*Id.* at 609 (concurring opinion)). I dissented, again complaining that the Court's failure to adhere to the commands of strict statutory interpretation of penal statutes was at the root of its dire and dogmatic interpretation of the Graves Act.

In this case, I find myself once more in somewhat of a mésalliance with the Court in a Graves Act matter. The issue before this Court is whether a firearm must be proven to be operable as a prerequisite to imposing a Graves Act sentence. *Ante,* at 577. The majority concludes "that the Graves Act is

directed at real guns which pose actual physical dangers to the potential victims of the crime." *Ante* at 582. I agree with this. The Graves Act is concerned with those in criminal possession of "real guns." This view of the deterrent theory of the Graves Act, which encourages criminals to think twice prior to going forth to commit crimes while armed with guns, serves as the foundation for the majority's holding.

The Court in determining what is a "real gun" states that the relevant inquiry is not "a device's present operability, but ... its original design." *Ante* at 584. According to the Court's definitional formula as to the meaning of "firearm," if the design of a firearm itself bespeaks the objective capacity or potential of the weapon to kill by firing a projectile, its possession will automatically implicate the Graves Act. This is so—at least in the absence of any evidence indicating that the original design of the gun *qua* lethal weapon has been permanently changed as a result of the weapon having become permanently inoperable. If the weapon has been rendered permanently inoperable, it can no longer be considered a "real gun."

Curiously the Court eschews a statement that operability of the weapon is in actuality an essential element of a Graves Act offense. Hence its approach to a sensible understanding of the term "firearm" seems somewhat obscure and elliptical. I fully recognize that the rules of strict construction extending to penal statutes, such as the Graves Act, *Neeld v. Giroux,* 24 *N.J.* 224, 229 (1957); *State v. Brenner,* 132 *N.J.L.* 607, 611 (E. & A. 1944), do not prohibit the imputation of distinct meanings to the definition of the term "firearm" when used in the variant contexts of a substantive offense and a sentencing provision. *See Commonwealth v. Ponds,* 236 *Pa.Super.* 107, 345 *A.*2d 253, 255 (1975) ("The use of different standards of operability for different legislation is not unreasonable in light of the different purposes behind the legislation"); *People v. DeWitt,* 285 *A.D.* 1157, 140 *N.Y.S.*2d 190 (1955); *see also Taylor v. State,* 467 *So.*2d 367 (Fla.App. 2 Dist.1985) (vicarious possession, while sufficient to sustain a conviction for possession of a

firearm, is not sufficient to justify imposition of a minimum three year period of imprisonment under the statute). However, the principles of strict construction should be applied so that in cases where there exists "a margin of error ... affecting the breadth of [a penal statute's] coverage, that margin should be narrowed as much as language reasonably permits to assure fairness and justice in the law's individual applications." *State v. Des Marets, supra,* 92 *N.J.* at 105 (dissenting and concurring opinion).

Fairness and justice in defining the meaning of a "firearm" in the context of an enhanced sentencing provision demand that operability be established as an essential element to sentencing under the Graves Act. *United States v. Terry,* 760 *F.*2d 939 (9th Cir.1985); *York v. State,* 56 *Md.App.* 222, 467 *A.*2d 552 (Md.Ct.Spec.App.1983), *cert.* denied, 299 *Md.* 137, 472 *A.*2d 1000 (1984); *State v. Morris,* 440 *A.*2d 1035 (Me.1982); *Rusling v. State,* 96 *Nev.* 778, 617 *P.*2d 1302 (1980). That element, I submit, may be established by direct evidence or evidence founded on reasonable inferences. See discussion *infra* at 596. In this case, I do not fault the Court with any laxity in construing the statute with sufficient strictness and circumspection. As noted, it rules that if there is evidence of permanent inoperability, the gun cannot be considered a "firearm" for Graves Act purposes. I agree that possession of a gun that is permanently inoperable should not be deemed a Graves Act offense. I concur in the opinion of the Court because I believe that its holding implicitly embraces a recognition as to the essentiality of the operability of a firearm, albeit in the sheep's clothing of design. The Court clearly acknowledges that the State must prove that the weapon is a "firearm" in the sense that it was designed as a lethal gun. It simply chooses to posit the relevance of operability under its design rubric. However, regardless of whether the standard of operability is expressed directly or is stated indirectly as an aspect of the design of the gun, the major burden of proof, both in terms of production and persuasion, is substantially the same.

The Court suggests that a reason for preferring a definition of firearm based on "design" is that proof of operability "would effectively eliminate the application of the Graves Act in all cases in which the defendant has discarded or secreted a weapon." *Ante* at 585. However, the burden of proving operability in no way compromises the application of the Graves Act. We have consistently recognized the various forms of evidence that may establish whether a gun has retained the qualities of operability. See *State v. Cole,* 154 *N.J.Super.* 138, 146 (App.Div.1977) ("the application of the inference of operability cannot be made to depend on the recovery of the weapon or its production in court."); *State v. Schulthesis,* 113 *N.J.Super.* 11, 16 (App.Div.), *certif. denied,* 58 *N.J.* 390 (1971) (testimony by an eyewitness that a gun was a "real gun" was tantamount to legal proof "that the gun was capable of being fired."). See also *State v. Millett,* 392 *A.*2d 521 (Me.1978) (recognizing that lay testimony would suffice in deciding whether the object involved was a "real gun").

I consequently would find nothing untoward in an interpretation of the Graves Act that would posit a rebuttable presumption of operability for purposes of determining whether the weapon used during the commission of the crime was a "firearm" justifying imposing a Graves Act sentence. *Cf. State v. Ingram,* 98 *N.J.* 489, 498 (1985) (permitting a jury to infer, until the defendant comes forward with some evidence to the contrary, that a defendant does not possess a license or permit to carry a weapon as required under *N.J.S.A.* 2C:39–2). The majority's concern that such a presumption would invite "protracted inquiry" into various issues raised by a defendant in rebuttal, *Ante* at 586, fails to recognize that a defendant would be similarly entitled to show that the gun is not a "firearm" in that it was not or is no longer designed as a gun because it is permanently inoperable. Thus, the Court itself, through the backdoor of its design-definition, recognizes the relevance of such evidence and the permissibility of such infer-

ences on the issue of inoperability as related to design. *Ante* at 589.

I hope with this opinion I can lay to rest my differences with the Court on these matters. As Justice Clifford observed in another case with respect to the quandry posed by his continuing differences with a majority of his colleagues:

> The Talmud says that if, when you are stone sober, a man tells you that you are drunk, knock his teeth out; if two men tell you that, laugh at them; but if three men tell you that, go to bed.
>
> [*Lynch v. Rubacky,* 85 *N.J.* 65, 79 (1981) Clifford, J., dissenting.]

I shall be sanguine about the state of my current sodality with the Court in this area, but confess to some trepidation as I see gathering on the horizon portentous issues that may yet break upon us. *E.g. Commonwealth v. Wright,* —— *Pa.* ——, 494 *A.*2d 354, *cert. granted sub nom. McMillan v. Pennsylvania,* 474 *U.S.* ——, 106 *S.Ct.* 58, 88 *L.Ed.*2d 47 (1985). Accordingly, I concur in the judgment of the Court.

HANDLER, J., concurring in the result.

*For affirmance* —Chief Justice WILENTZ, and CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN— 7.

*For reversal* —None.